UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Christine Ekalliipse Mouloki,** : | |
| Plaintiff, : | |
| : | *Civil Action No.* |
| v. : | **COMPLAINT** |
| : | **(Jury Trial Demanded)** |
| **Marie Paule Epee and Eric Ngado Epee,** : | **(Electronically filed)** |
| Defendants. : | |

Plaintiff Christine Ekalliipse Mouloki, also known as Christine Ekalle ("Plaintiff" or "Ms. Ekalle"), by and through her undersigned attorneys, with personal knowledge as to herself and her actions and otherwise on information and belief, hereby alleges as follows:

## I.     INTRODUCTION

1.      Human trafficking is a modern-day form of slavery, involving victims who are forced, defrauded, or coerced into labor exploitation.  Trafficking in human beings is reaching epidemic proportions throughout the world, including in the United States.  President Obama has called human trafficking "a debasement of our common humanity that tears at the social fabric of our communities, distorts markets, endangers public health, and fuels violence and organized crime." Recognizing the countless human tragedies such practices inflict, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003 (the "TVPRA"), establishing a private cause of action for victims of human trafficking to ensure both that victims can be made whole and that the perpetrators of this inhumane practice are deterred from committing such acts.  This action is brought under the TVPRA and other federal and state laws to seek just compensation for a victim of human trafficking, Ms. Ekalle.

2.      Defendants Marie Paule Epee and Eric Ngado Epee ("Defendants" ) lured Ms. Ekalle to the United States under false promises of the terms and conditions of her employment, including good pay, housing, and the ability to freely return to her children in her home country of Cameroon.  Defendants procured Ms. Ekalle's travel to the United States on another person's passport and falsely promised to legalize Ms. Ekalle's immigration status after her arrival.  Ms. Ekalle agreed to come to the United States for a limited time in order to provide greater financial support to her children.  But immediately upon her arrival, and for the next five and a half years (May 8, 2002 through December 9, 2007), she was forced to work long, grueling days, and was rarely if ever given a single day off, for little or no compensation, under inhumane conditions.  In the beginning, Ms. Ekalle was paid as little as $0.10 per hour that she worked, and by the time she left, her pay had been increased to only $0.70 per hour.  Nevertheless, Ms. Ekalle lovingly

and with great dedication took care of Defendants' children. Defendants preyed on Ms. Ekalle's immigration status, lack of education, inability to communicate in English, and unfamiliarity with the United States and its laws in order to render her a slave for them.

3.      Ms. Ekalle brings this civil action under the TVPRA, the federal Fair Labor Standards Act, the Illinois Labor Law and state common law.   By this complaint, Ms. Ekalle seeks redress for Defendants' egregious violations of her basic human and civil rights.

## II.      JURISDICTION

4.      Jurisdiction of the subject matter of this action is established under 28 U.S.C. § 1331 and the TVPRA, 18 U.S.C. § 1589 *et. seq.*

5.      This Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.  Supplemental jurisdiction over those claims exists because they arise from the same common nucleus of operative facts from which the federal claims arise.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## III.      PARTIES

7.      Plaintiff Christine Ekalle is a citizen of Cameroon who resided in Schaumburg, Illinois from the time of her arrival in the United States on May 8, 2002 until December 9, 2007. Since then, Ms. Ekalle has resided in the New York City area.

8.      Upon information and belief, Defendants Marie Epee and Eric Epee are a married couple who own two homes in Illinois, one at South Springinsguth Road, Schaumburg, Illinois, 60193 and the other at 225 Ivy Ct. Streamwood, Illinois 60107.  Defendants employed Ms. Ekalle at their Schaumburg, Illinois residence from May 8, 2002 until December 9, 2007.  Upon information and belief, at all times relevant herein, Defendants were employers pursuant to Illinois Labor Laws and the Fair Labor Standards Act.

## IV.      FACTUAL ALLEGATIONS

9.      Plaintiff Christine Ekalle was born on August 6, 1965 in Douala, Cameroon.

10.     In Cameroon, Ms. Ekalle lived with family members. Ms. Ekalle has two children, Ntone Vincent Jacque-Oliver, born September 23, 1983, and Sicke Hermine Yoolande, born June 7, 1989.

11.     In or about 2000, Ms. Ekalle was working as a nanny in Cameroon. Ms. Ekalle was introduced to Defendant Marie Epee through a mutual acquaintance during Defendant Marie Epee's visit to Cameroon from her home in the United States. Ms. Ekalle learned that Defendant Marie Epee was searching for a nanny who could look after her child while she was in Cameroon to visit. Ms. Ekalle's grandmother and Defendant Marie Epee's grandmother were members of the same community in Cameroon, and had been close friends since childhood.

12.     At that time, Defendant Eric Epee, Marie Epee's husband, worked for United Airlines.

13.     In 2000, Defendants hired Ms. Ekalle to babysit their son, Kenny Tevin Epee, during their December vacation to Cameroon. Ms. Ekalle cared for Kenny Epee for approximately two to three weeks. During this time, Ms. Ekalle lived with Defendants. Ms. Ekalle was paid what she was promised by Defendant Marie Epee.

14.     In January 2001, Defendants had another child, Kimberly Talia Epee.

15.     In December 2001, Defendants again hired Ms. Ekalle to babysit and care for Kenny Epee and Kimberly Epee for two to three weeks during another visit to Cameroon from their home in the United States. Defendants again paid Ms. Ekalle the amount promised.

16.     During the Defendants' 2001 visit to Cameroon, Defendant Marie Epee asked Ms. Ekalle to accompany the family back to the United States, so that Ms. Ekalle could be a nanny for Defendants' younger child, Kimberly, while Marie Epee went back to school. Defendants promised Ms. Ekalle gainful employment for good pay and her own room in Defendants' house in Illinois, and ultimately housing on her own outside the family home.

17.     Ms. Ekalle accepted the offer of employment in the United States because she understood that it would pay better than an equivalent job in Cameroon and she wanted to be able to provide greater financial support to her children.

4

18.     Ms. Ekalle was advised that the job as Defendants' nanny would last for at most three years, because that was how long Defendants told Ms. Ekalle they were staying in the United States, and then she would be able to return to her children and family in Cameroon.

19.     Ms. Ekalle trusted Defendants based on their mutual grandparents' connection and the interactions that they had in Cameroon.

20.     Defendants returned to the United States. Ms. Ekalle stayed in Cameroon in order to obtain a visa to travel legally to the United States.

21.     Defendant Marie Epee paid for all of Ms. Ekalle's expenses related to obtaining a visa. Defendant Marie Epee arranged and paid for Ms. Ekalle to apply for a visa from the U.S. Embassy. First, Defendant Marie Epee's family instructed Ms. Ekalle to indicate that she was visiting her brother in the United States and to show the title of the land she owned in Cameroon as proof that she would return. However, the U.S. Embassy rejected her visa application. Defendant Marie Epee then arranged and paid for Ms. Ekalle to apply for a visa from the French Embassy, but again Ms. Ekalle's visa application was rejected. At Defendant Marie Epee's direction and with her financial support, Ms. Ekalle tried again at the German Embassy with the same result. Upon information and belief, each new visa application cost Defendant Marie Epee $150. Defendant Marie Epee's family filled out each application for Ms. Ekalle.

22.     When the efforts to obtain a visa in Ms. Ekalle's own name proved unsuccessful, Defendant Marie Epee mailed Ms. Ekalle the French passport of Defendant Eric Epee's cousin. Defendant Marie Epee instructed Ms. Ekalle to use this passport to enter the United States. Ms. Ekalle only needed to go to Cameroonian immigration authorities and get the passport stamped before she could travel to the United States. Defendant Marie Epee told Ms. Ekalle that Defendants would obtain lawful immigration status for Ms. Ekalle once she was in the United States.

23.     Defendant Marie Epee sent Ms. Ekalle a round trip ticket on Swiss Air to the United States that Defendant Marie Epee purchased.

24.     Defendant Marie Epee instructed Ms. Ekalle to not bring many personal items to the United States, because Defendant Marie Epee told Ms. Ekalle that Defendants would purchase clothes and personal items for her in the United States.

25.     Ms. Ekalle left Cameroon on May 7, 2002. Ms. Ekalle arrived in Chicago, Illinois on May 8, 2002.

26.     Defendant Eric Epee picked Ms. Ekalle up at the airport. Defendant Eric Epee brought Ms. Ekalle to the Defendants' residence at 327 South Springinsguth Road, Schaumburg, Illinois, 60193.

27.     Upon Ms. Ekalle's arrival, the first thing Defendant Marie Epee did was take back the French passport that Ms. Ekalle used to enter the United States.

28.     On Ms. Ekalle's first day in the United States, May 8, 2002, Defendants gave her a tour of Schaumburg, Illinois and their residence. Defendants then immediately engaged Ms. Ekalle in work. Defendants required Ms. Ekalle to constantly care for their two children, Kenny, who was approximately three years old, and Kimberly, who was approximately eighteen months old, twenty-four hours a day, in addition to doing all of the cooking, cleaning, and ironing in the house. Defendants also required Ms. Ekalle to shovel snow from the driveway and sidewalks during the winter, and to garden the sizable backyard during the summer. Occasionally, Ms. Ekalle was also required to care for Defendant Marie Epee's friends' children without pay. Ms. Ekalle's average day would begin at 6:30 AM and end around 11 PM or 12 AM. Some days, Ms. Ekalle's day would end as late as 3 AM, and she was required to wake up and address any needs that the children might have throughout the night.

29.     Although Defendants had promised Ms. Ekalle her own room, Ms. Ekalle was forced to sleep in the children's room on a mattress on the floor. When guests came to the house, Defendants forced Ms. Ekalle to sleep in the basement.

30.     Despite promising to buy Ms. Ekalle clothes in the United States, Defendants provided only a hand-me-down sweater from Marie Epee and Pepsi branded clothing from Defendant Eric Epee's then-current employer. When the weather became cold, and Ms. Ekalle

6

was required to shovel snow, Ms. Ekalle was forced to buy her own winter clothing, including coats and boots, out of her meager earnings on shopping trips with Defendant Marie Epee.

31.     Defendants informed Ms. Ekalle that they could not afford to pay her for the first few months because Defendant Eric Epee had lost his job at United Airlines and had just started a new position at Pepsico. After two months with no payment at all, Defendants started paying Ms. Ekalle $50 a month, and explained that they could not pay her more because Defendant Eric Epee had just had surgery, and Defendant Marie Epee was going back to school. After paying Ms. Ekalle nothing for two months, Defendants effectively paid Ms. Ekalle approximately $0.10 per hour for her work. This estimate would be even lower if the hours she was expected to be on-call to help with the children while they slept were included in the calculation.

32.     From May 8, 2002 through August 1, 2003, Ms. Ekalle cared for both of Defendants' children all hours of the day and night. Defendants required Ms. Ekalle to wake up at all times of the night in order to tend to the children.

33.     On or around August 1, 2003, Kenny Epee turned 4 years old and began attending preschool across the street from Defendants' residence. In addition to caring for Kimberly, Ms. Ekalle would walk Kenny to preschool, and care for him before and after preschool hours.

34.     Defendants forced Ms. Ekalle to work seven days a week without any days off. If Defendant Marie Epee caught Ms. Ekalle resting, Defendant Marie Epee would find more work for Ms. Ekalle to do. Ms. Ekalle was required to attend outings with Defendants, including attending church on Sundays. Ms. Ekalle was not given any opportunity to have private time to herself.

35.     One month of each year, Defendants would go on vacation with the children. Most years, Defendants left Ms. Ekalle alone in the house. Defendants would leave groceries for Ms. Ekalle. Ms. Ekalle did not typically leave the house during their vacation and on the rare occasions when she did leave the house, she would have to rely on others to help her. During the vacation time, Ms. Ekalle was still required to perform her household duties that were not related to taking care of the children. During the first family vacation that Ms. Ekalle was left in the

house for, an individual who worked at Pepsico and was supervised by Defendant Eric Epee would periodically go by the house to check on Ms. Ekalle.

36. During the second year of Ms. Ekalle's forced labor, Defendants began to pay Ms. Ekalle $100 a month, or approximately $0.20 per hour worked, twice what she had been earning prior. They continued to increase her salary by small amounts, until, in 2007, she was earning $350 a month, or approximately $0.70 per hour worked.

37. Defendant Eric Epee would keep a portion of this money, supposedly on Ms. Ekalle's behalf, in what he told Ms. Ekalle was a savings account for her benefit. He promised that the money would get to Ms. Ekalle at some point in the future. Ms. Ekalle believes that at the time she left, the total amount that Defendant Eric Epee kept "for her" was $500. Defendant Eric Epee never gave Ms. Ekalle access to this saving account, or returned to Ms. Ekalle the money that he supposedly had deposited in a savings account for her.

38. Ms. Ekalle was isolated in Defendants' home and neighborhood. Defendants provided only an initial driving tour on Ms. Ekalle's first day in the United States. Ms. Ekalle could not speak or read English well, was unable to drive, and rarely had time away from the children to learn about the United States and her surroundings. Ms. Ekalle was rarely able to leave the house alone. If she left the house, it was typically with the children to the park or mall. In order to go to the mall with the children, Defendants would drop them off. On a few occasions, Ms. Ekalle took the bus to the mall, but only when Defendants were not home. In order to use the neighborhood bus, Ms. Ekalle had to phone for it an hour in advance. Ms. Ekalle was able to use the bus only a few times during her employment. Ms. Ekalle was never given the opportunity to become familiar with the neighborhood and did not know how to get around on her own, because she was typically only driven to places by Defendants when and if Defendants wanted her to go there.

39. Ms. Ekalle did not have her own set of keys to Defendants' house. Defendants provided a key to Ms. Ekalle when she took the children out, but Ms. Ekalle was required to return the house key upon her return.

8

40.    Ms. Ekalle was not allowed to use the house phone. Ms. Ekalle was required to buy prepaid phone cards in order to call home to Cameroon. Most of the paltry wages she received from Defendants went to prepaid phone cards because it was expensive to call Cameroon. At the beginning of her employment, Ms. Ekalle would call her family in front of Defendant Marie Epee. Later, when Ms. Ekalle began to feel that she was being treated unfairly by Defendants, she would try to call in private. However, when Ms. Ekalle tried to have private conversations, Defendant Marie Epee would become angry, and would want to listen to Ms. Ekalle's conversations.

41.    Ms. Ekalle was only able to receive mail and send mail to her family in Cameroon through Defendant Marie Epee's family, when they came to and from the United States. Defendant Marie Epee's family would hand deliver the mail; it would not be placed in the postal system.

42.    At one point, Ms. Ekalle asked Defendant Marie Epee if she could visit downtown Chicago. Defendant Marie Epee threatened that if Ms. Ekalle left the house, she would never be able to return and would therefore have nowhere else to go. Defendant Marie Epee became angry at this request, and pushed and shoved Ms. Ekalle, preventing her from leaving the home. Defendant Marie Epee raised a hand as if to hit Ms. Ekalle, and Ms. Ekalle said in response that she would call the police if she was hit. Defendants informed Ms. Ekalle that she could not call the police because she was illegally staying in the United States, and that if anyone were to call the police, it would be Defendants. Defendants threatened Ms. Ekalle that they came to the United States with proper paperwork, whereas she did not, so they were in control. In the beginning of her employment, Ms. Ekalle did not know that she should fear not having the proper paperwork, because Defendants assured her that they would help her get the proper paperwork. At or around this time, Ms. Ekalle realized that Defendants would not be helping her obtain the proper paperwork, and that she was not able to freely leave or return to Cameroon.

43. In or around 2004, Ms. Ekalle asked for one day off a week. By this time, Defendant Marie Epee had graduated from school. Defendant Marie Epee became angry at this request and informed Ms. Ekalle that she could not have a day off, because "here in the United States, there is no rest." Apparently as a result of this request, Defendant Marie Epee decided not to give Ms. Ekalle the small increase in pay she had promised her.

44. Defendants further isolated Ms. Ekalle by allowing Ms. Ekalle to interact with only a limited number of people in the community. Early in her employment, Ms. Ekalle visited with others in her community only when the children had play dates. Later, when Defendants became more abusive towards Ms. Ekalle, Defendants discouraged Ms. Ekalle from interacting with her friends. Ms. Ekalle was only able to visit her friends alone when Defendants went on their yearly vacation.

45. Ms. Ekalle became ill from the constant work and sleep deprivation. Despite having stomach pains for a long period of time, Defendant Marie Epee told Ms. Ekalle that she could not go to the doctor because Ms. Ekalle was not legally in the United States. In the fall of 2006, Ms. Ekalle had to go to the hospital due to a stomach ulcer. Ms. Ekalle spent three days at the hospital for surgery. Once she returned to the Defendants' home, they forced her to return to work immediately and did not allow her to rest, even though Ms. Ekalle had stitches that had not healed. Defendant Marie Epee also refused to pay for Ms. Ekalle's medical bills.

46. Defendants never explained to Ms. Ekalle, nor did she have the resources or ability to learn, of minimum wage and overtime laws that governed the minimum amount she should have been paid.

47. Around 2007, Ms. Ekalle learned that Defendants, along with Defendant Marie Epee's mother who was visiting Defendants at the time, were considering arrangements to require Ms. Ekalle to continue working in the United States after Defendants left the country, as they were planning to return to Cameroon. Ms. Ekalle learned that Defendant Marie Epee and her mother were seeking to place Ms. Ekalle with Defendant Marie Epee's mother's cousin, Marie Kwate Reed. When Ms. Ekalle spoke with Ms. Reed about the possibility of working for

her, Ms. Reed informed Ms. Ekalle that Ms. Reed had spoken with Defendant Marie Epee's mother and learned what Defendants were paying Ms. Ekalle. Ms. Ekalle shared with Ms. Reed additional information about her working conditions. In response, Ms. Reed informed Ms. Ekalle that what the Defendants were doing to Ms. Ekalle was wrong, and the equivalent to slavery. Ms. Reed promised that if Ms. Ekalle could make her way to New York, she could stay with her.

48. On December 9, 2007, Defendants dropped Ms. Ekalle off at a shopping center to run errands for them; they planned to pick her up a few hours later. Ms. Ekalle prearranged to have someone meet her at the shopping center that day and drive her to a friend's home where she had begun to store some of her belongings in anticipation of this escape. Once at the friend's house, her friend helped her call a taxi to take her to the bus station in Chicago, where she boarded a bus to New York City.

49. Defendant Marie Epee called Ms. Ekalle's cell phone, which Defendant Marie Epee had given her for use with pre-paid calling cards, several times after her escape, leaving messages telling her that Ms. Ekalle's departure had upset the children, and informing Ms. Ekalle that Defendants reported her missing to the police.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act, Peonage,
18 U.S.C. §§ 1581, 1595**
(Against All Defendants)

50. Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

51. The peonage provision of the TVPRA, 18 U.S.C. § 1581, establishes:

"(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both."

52.     Defendants Marie Epee and Eric Epee intentionally held Ms. Ekalle against her will and obtained her labor and services through threats and intimidation.

53.     Defendants Marie Epee and Eric Epee intentionally caused Ms. Ekalle to be transported to the United States. After Ms. Ekalle arrived in the United States, Defendants Marie Epee and Eric Epee repeatedly told her that she was unable to leave or seek help based on her illegal immigration status. Defendants preyed on Ms. Ekalle's lack of knowledge of the United States and English in order to isolate her and force her to work under unreasonable conditions.

54.     Defendants Marie Epee and Eric Epee forced Ms. Ekalle to provide labor and services under inhumane conditions without rest.

55.     Defendants' conduct constituted holding and/or returning Ms. Ekalle to a condition of peonage.

56.     As a result of Defendants' conduct, Ms. Ekalle has suffered damages in an amount to be determined at trial.

57.     Pursuant to 18 U.S.C. § 1595(a), which provides for recovery of civil damages for violations of § 1581, Ms. Ekalle is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for Defendants' wrongful conduct.

## SECOND CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act, Forced Labor,**
**18 U.S.C. §§ 1589, 1595**
(Against All Defendants)

58.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

59.     The forced labor provision of the TVPRA, 18 U.S.C. § 1589, establishes: "(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious

harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)."

60.     Defendants Marie Epee and Eric Epee knowingly obtained Ms. Ekalle's labor and services by unlawfully procuring her travel to the United States under another person's passport, and once she arrived in the United States, through threats and intimidation, including threats to report Ms. Ekalle to the legal authorities causing her to fear that she would be arrested, or detained, by law enforcement authorities.

61.     Defendants used threats and intimidation to hold Ms. Ekalle in captivity and force her to work without paying her the compensation required by law.

62.     As a result of Defendants' conduct, Ms. Ekalle has suffered damages in an amount to be determined at trial.

63.     Pursuant to 18 U.S.C. § 1595(a), which provides for recovery of civil damages for violations of § 1589, Ms. Ekalle is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for Defendants' wrongful conduct.

### THIRD CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**
**Trafficking Into Servitude, 18 U.S.C. §§ 1590, 1595**
(Against All Defendants)

64.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

65.     The trafficking into servitude provision of the TVPRA, 18 U.S.C.§ 1590, provides: recruiting, harboring, transporting, providing, or obtaining by any means any person for labor or services in violation of laws prohibiting peonage, slavery, involuntary servitude, or forced labor shall subject defendant to fines.

66.     As set forth herein, Defendants knowingly recruited, harbored, transported, provided, and obtained Ms. Ekalle to provide labor and services to Defendants in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor.

67.     As a result of Defendants' conduct, Ms. Ekalle has suffered damages in an amount to be determined at trial.

68.     Pursuant to 18 U.S.C. § 1595(a), which provides for recovery of civil damages for violations of § 1590, Ms. Ekalle is entitled to recover damages, including punitive damages, and reasonable attorneys' fees for Defendants' wrongful conduct.

## FOURTH CLAIM FOR RELIEF

### Fair Labor Standards Act
### Federal Minimum Wage and Overtime Pay, 29 U.S.C. §§ 206, 207, 216 (b)
(Against All Defendants)

69.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

70.     Plaintiff and Defendants were in an employment relationship within the meaning contemplated by 29 U.S.C. §203(d)-(e) from May 8, 2002 until on or around December 9, 2007.

71.     The federal minimum wage from September 1, 1997 through July 23, 2007 was $5.15 per hour, and from July 24, 2007 through July 23, 2008 was $5.85 an hour pursuant to 29 U.S.C. § 206.

72.     29 U.S.C. § 206  provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one half times the regular rate at which he is employed."

73.     Defendants willfully and knowingly failed to pay Plaintiff the statutory minimum wage and overtime pay for her labor and services in violation of 29 U.S.C. §§ 206,

207.

74.     Due to Defendants' FLSA violations, Ms. Ekalle is entitled to recover the amount of her unpaid minimum wages and overtime, and an additional equal amount as liquidated damages, attorneys' fees, and costs, pursuant to 29 U.S.C. § 216(b).

### FIFTH CLAIM FOR RELIEF

**Illinois Minimum Wage Law**
**Minimum wage and overtime compensation, 820 I.L.C.S. §§ 105-2, 105-4**
(Against All Defendants)

75.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

76.     820 I.L.C.S. § 105-2 provides that "[i]t is against public policy for an employer to pay to his employees an amount less than that fixed by this Act. Payment of any amount less than herein fixed is an unreasonable and oppressive wage, and less than sufficient to meet the minimum cost of living necessary for health."

77.     The minimum wage per hour from July 1, 1985 through December 31, 2003 was $3.35 per hour, from January 1, 2004 through December 31, 2004 was $5.50 per hour, from January 1, 2005 through June 30, 2007 was $6.50 per hour, and from July 1, 2007 through June 30, 2008 was $7.50 per hour pursuant to 820 I.L.C.S. § 105-4(a)(1).

78.     Ms. Ekalle was employed by Defendants from May 8, 2002 until on or around December 9, 2007.

79.     820 I.L.C.S. § 105-4(a)(1) provides that "no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed."

80.     Defendants did not pay Ms. Ekalle the required minimum hourly wage or compensate her for overtime work.

81.     Defendants' failure to pay Ms. Ekalle the minimum wage and overtime

violated the ILCS.

82.     Due to Defendants' ICLS violations, Ms. Ekalle is entitled to recover the amount of her unpaid minimum wages and overtime, attorneys' fees, and costs, pursuant to 820 I.L.C.S. § 105-12(a).

83.     In addition, Defendants' failure to pay Ms. Ekalle the minimum wage and overtime was willful, repeated and/or with reckless disregard for the ILCS.   Therefore, Ms. Ekalle is also entitled to recover damages in the amount of 2% of her unpaid minimum wages and overtime pay for each month following the due date of payment, pursuant to 820 I.L.C.S. § 105-12(a).

## SIXTH CLAIM FOR RELIEF

### Illinois Labor Law
### Frequency of Payments, Illinois Labor Law 820 I.L.C.S.  §§ 115-3, 115-4, 1115-5, 115-14
(Against All Defendants)

84.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

85.     Pursuant to 820 I.L.C.S.  §§ 115-3 and 115-4, "[e]very employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period" and "[a]ll wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned."

86.     820 I.L.C.S.  § 115-5 requires that "[e]very employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."

87.     Ms. Ekalle did not receive payment of wages for hours worked within thirteen days after the end of either a bi-weekly or semi-monthly period in which the wages were earned, in violation of 820 I.L.C.S.  §§ 115-3 and 115-4.

88.     Ms. Ekalle did not receive full final compensation at the end of her

employment, nor did she receive full final compensation at the end of either a bi-weekly or semi-monthly period.

89.     Due to Defendants' ILCS violations, Ms. Ekalle is entitled recover unpaid wages, final compensation, and/or wage supplements. Ms. Ekalle is also entitled to 2% of the amount of her underpayment for each month following the due date of payment during which they remain unpaid, reasonable attorneys' fees, and costs pursuant to 820 I.L.C.S. § 115-14(a).

## SEVENTH CLAIM FOR RELIEF

### Conversion
(Against All Defendants)

90.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

91.     Defendants claimed to have deposited at least a portion of Ms. Ekalle's wages into a savings account. Ms. Ekalle never had access to or received these deposited wages, and was not a signatory to any such account. Defendants willfully and knowingly refused to return Ms. Ekalle's wages that they purportedly deposited in a savings account, falsely claiming that the savings account was for Ms. Ekalle's benefit.

92.     Ms. Ekalle is entitled to recover all wages purportedly deposited into the savings account by Defendants on her behalf, or otherwise converted by them, plus all accrued interest, in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### Fraudulent Misrepresentation
(Against Defendant Marie Epee)

93.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

94.     Prior to Ms. Ekalle's arrival in the United States, Defendant Marie Epee represented to her that if she came to the United States to work for Defendants, Ms. Ekalle would

be generously compensated, provided with a room, and able to return to her home in Cameroon at any time of her choosing, and at most, within three years. Ms. Ekalle then came to the United States to work for Defendants in reliance on this false representation. Contrary to that false representation, upon her arrival in the United States, Defendants forced Ms. Ekalle into slavery. Defendants forced Ms. Ekalle to work constantly with little to no pay. Defendants also forced Ms. Ekalle to sleep on the floor in the children's room or in the basement, and refused to allow Ms. Ekalle to return to her home in Cameroon.

95.     Upon information and belief, from the beginning, Defendants never intended to gainfully employ Ms. Ekalle, provide her with humane living arrangements, or allow her to return to her home. Rather Defendants intended to subject her to trafficking, peonage, slavery, involuntary servitude, and forced labor in violation of federal, state, and common law. That intention is evident through, among other things, Defendant Marie Epee's insistence that Ms. Ekalle come to the United States despite not having the proper paperwork, the manner in which Ms. Ekalle was threatened beginning immediately upon her arrival in the United States and throughout her time with Defendants, and the continued desire to keep Ms. Ekalle employed in servitude even after Defendant Marie Epee no longer needed her services.

96.     Ms. Ekalle justifiably relied on Defendant Marie Epee's misrepresentations in deciding to leave her life and family in Cameroon to work in the United States for a limited time.

97.     Ms. Ekalle's justifiable reliance on Defendant Marie Epee's false representations caused injury to her, including, among others, lost wages, and overtime compensation in an amount to be proven at trial.

98.     Defendant Marie Epee committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, entitling Plaintiff to recover punitive and exemplary damages.

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment
(Against All Defendants)

99.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

100.     Defendants Marie Epee and Eric Epee were unjustly enriched because Ms. Ekalle worked for Defendants for little to no compensation.

101.     Defendants were also unjustly enriched because Defendant Eric Epee kept a portion of Ms. Ekalle's compensation in an alleged savings account that he did not provide her access to or return to her.

102.     Defendants received the benefit of Ms. Ekalle's under paid labor though fraudulent and unconscionable conduct.

103.     Equity and good conscience require that Ms. Ekalle receive restitution.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against Defendants, and each of them, awarding Ms. Ekalle relief as follows:

1.     General, compensatory and special damages in an amount to be proven at trial;

2.     Unpaid wages, including minimum wages and overtime premiums, in an amount to be proven at trial;

3.     The return of the wages kept in a savings account on her behalf, in an amount to be proven at trial;

4.     Statutory penalties and liquidated damages in an amount to be proven at trial;

5.     Punitive and exemplary damages;

6.     Pre- and post-judgment interest;

7.     Reasonable attorney's fees and costs; and

8.     Such other and further relief as the Court deems just and proper.

Dated: July 21, 2014

Respectfully submitted,

By: s/Thomas R. Hill

Thomas R. Hill
DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
T: 312-876-1700
F: 312-876-1155

Steven J. Fink
Rene A. Kathawala
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, New York 10019-6142
Telephone: (212) 506-3756
Facsimile:(212) 506-5151

Trish Higgins
Zheng (Jen) Liu
Johanna L. Jacob
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, Ca 94105
Telephone: (415) 773-5700
Facsimile:(415) 773-5759

Dana Sussman
Safe Horizon Anti-Trafficking Program
50 Court St., New York 11201
Telephone: (718) 943-8641
Facsimile: (718) 943-8653

*Attorneys for Plaintiff Christine Ekalle*