IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHRISTINE EKALLIIPSE MOULOKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 5532 |
| | ) | |
| MARIE PAULE EPEE & ERIC NGADO EPEE, | ) | Judge Virginia M. Kendall |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Ekalliipse Mouloki filed a nine-count Complaint seeking relief for the childcare she provided Defendants Marie Paule Epee and Eric Ngado Epee after she moved to the United States from Cameroon. The Epees move for leave to file an Amended Answer to the Complaint and for partial summary judgment. For the below reasons, the Court denies the Epees' Motion for Leave to File Amended Answer to Complaint [120] and the Court grants in part and denies in part the Epees' Partial Motion for Summary Judgment. [126]

## BACKGROUND

The parties do not dispute the below facts unless otherwise noted.

Plaintiff Christine Ekalliipse Mouloki ("Mouloki") was born in 1965 in Douala, Cameroon. (Dkt. 1, ¶ 9.) She did not attend college or obtain any kind of higher education. (Dkt. 149, ¶ 1.) She cannot speak or read English well.[1] (*Id.*, ¶ 12.)

Defendant Eric Ngando Epee ("Mr. Epee") was born and raised in Cameroon and later moved to France to pursue his education. (Dkt. 143-5, at 4, 13:1-11.) Defendant Marie Paule

---

[1] Defendants argue that this assessment is subjective and therefore an inappropriate statement of fact that should be disregarded. (Dkt. 149, ¶ 12.)

Epee ("Mrs. Epee") was born and studied in France, but she has family in Cameroon and lived there for a period. (*See* Dkt. 149-1, at 1-2, 11:1-12:23; Dkt. 149-6, at 5, 99:16-19; Dkt. 143-4, at 3, 9:10-10:3.) The Epees, who are married to each other, are both U.S. citizens. (Dkt. 143, ¶ 7; Dkt. 143-4, at 7, 40:22-25.) Mrs. Epee has a Bachelor's Degree in business and took evening classes to earn her degree in early childhood development. (Dkt. 149-1, at 2-3, 12:3-13:2; Dkt. 149-2, at 3, 23:13-20; Dkt. 149-2, at 6, 26:1-3.) Mr. Epee earned his Master's in Business Administration in a full-time program at Duke University and then obtained a job working for United Airlines, which brought him to Chicago. (Dkt. 143-5, at 4-5, 16:19-17:11.)

Mrs. Epee traveled to Cameroon in December 2000. (Dkt. 149-2, at 2, 22:10-15.) Mouloki was living in Cameroon working as a nanny at the time of the Epees' visits. (Dkt. 1, ¶¶ 10-11; Dkt. 149-6, at 5, 99:4-5; Dkt. 149-3, at 6, 70:3-5.) Mouloki says that she cared for the Epees' children during their 2-3 week vacations to Cameroon in 2000 and 2001,[2] and they paid her money for doing so.[3] (Dkt. 149, at 2, ¶ 3; Dkt. 149-2, at 10, 30:2-19; Dkt. 149-3, at 6, 70:3-5.) The Epees have two children, Kenny and Kimberly. (Dkt. 1, ¶¶ 13-14.) Mouloki has two children of her own, Ntone Vincent Jacque-Oliver, who was born in 1983, and Sicke Hermine Yoolande, who was born in 1989. (*Id.*, ¶ 10.)

Mouloki says that the Epees asked her around that time to travel to the United States in order to work as their nanny; Mrs. Epee says that Mouloki came to live with the Epees after Mrs. Epee's mother called her and said that Mouloki needed some temporary help. (Dkt. 149, ¶ 4; Dkt. 149-2, at 10-11, 30:20-31:1.) Mouloki says that Mrs. Epee promised her good pay,

---

[2] Mrs. Epee disputes that she met Mouloki in 2000, stating instead that she meet Mouloki only in 2001 at her mother's house. (Dkt. 149-2, at 6-8, 26:24-28:10.) The dispute is not material to the issues in this motion.
[3] When asked at her deposition "Have you ever paid anyone to take care of your children?" Mrs. Epee replied "No." (Dkt. 149-3, at 6, 70:3-5.)

housing,[4] help obtaining legal immigration status, and assured her that if she came to the United States she could return home to Cameroon after three years of service once Mrs. Epee gave birth to all of her children. (Dkt. 143-1, ¶ 3; Dkt. 143-3, at 30, 57:16-24; Dkt. 149, ¶¶ 4-5, 8.) Mrs. Epee says that she and Mouloki never had any sort of agreement, let alone an employment agreement. (Dkt. 149-4, at 12, 55:10-18; Dkt. 149-5, at 3, 100:8-10.) She and Mrs. Epee never discussed specific numerical wages. (Dkt. 143, ¶ 19.) Mouloki never discussed any terms, tasks, salary, or wages with Mr. Epee. (*Id.* at ¶¶16-18.) In any case, Mr. and Mrs. Epee never threatened Mouloki or her family in order to make her come to the United States. (*Id.* at ¶¶ 12-15.)

Whatever the terms, Mouloki ultimately moved to the United States, though the Parties dispute the Epees' role in helping her get here. Mouloki contends that Mrs. Epee coordinated her travel to the United States, including procuring a French passport from Mr. Epee's cousin for Mouloki to use. (Dkt. 143-3, at 27-29, 54:11-56:6; Dkt. 149, ¶ 7.) She arrived in Chicago on May 8, 2002 and Mr. Epee picked her up from the airport. (Dkt. 149, ¶ 9.) Mouloki says that Mr. Epee took the passport back upon her arrival and that Mrs. Epee eventually took the passport back to France. (*Id.* at ¶ 10; Dkt. 143-3, at 29-30, 56:17-57:4.) Defendants gave Mouloki a brief tour of Schaumburg, Illinois, where they lived. (Dkt. 149, ¶ 11.) They did not explain to Mouloki how to contact the police or fire department. (*Id.* at ¶ 11.) Regardless, Defendants state that they "were not involved in assisting with [Mouloki's] travel from Cameroon to the United States." (Dkt. 143-8, at 4, Interrogatory No. 6.)

From her arrival in May 2002 until her departure from Chicago on December 9, 2007, Mouloki, Mr. Epee, and Mrs. Epee all resided together at the Epee household in Schaumburg,

---

[4] Mouloki says that Defendants promised her "a place of her own," which the Defendants only dispute by citing to their proposed Amended Answer to the Complaint that the Court does not permit them leave to file. *See infra*, Discussion, Part I.

Illinois.  (Dkt. 143, ¶ 8.)  Once in the Epee household, Mouloki cared for the Epee children and did household chores,[5] typically working from at least 6:30 a.m. to 10:00 p.m. and sometimes waking up in the middle of the night to care for the children.[6]  (Dkt. 149, ¶¶ 13, 23; Dkt. 143-5, at 15, 93:1-9.)  When Mouloki requested one day off per week, Defendants refused.[7]  (Dkt. 149, ¶ 17.)  Mr. and Mrs. Epee never discussed work hours with Mouloki.  (Dkt. 143, ¶¶ 20-21.)  Mouloki stayed in a bedroom with the two Epee children and slept on a twin mattress on top of a bed base while the children shared a bunk bed.  (Dkt. 143-8, at 5, Interrogatory No. 11; Dkt. 149, ¶ 18.)

During this time, Defendants did not ask Mouloki to pay rent or pitch in for food.  (Dkt. 149-4, at 12, 55:5-9.)  Defendants gave Mouloki cash, food, and clothes.[8]  Mouloki states that at first she was not given money but over time the Epees began providing her $50 each month and later that amount was increased to approximately $350 per month.  (Dkt. 149, ¶ 20.)  Mouloki claims that this cash equated to less than $1.00 per hour although she disputes that she was ever "paid."[9]  (*Id.*)  None of the parties memorialized in writing how much money the Epees gave to Mouloki.  (Dkt. 143, ¶¶ 22-25.)

In December 2007, Mouloki gave Mr. Epee approximately $600 to hold onto for her.  (Dkt. 143-8, at 4, Interrogatory No. 7; Dkt. 149-7, at 2-3, 121:1-122:3.)  Mouloki gave Mr. Epee

---

[5] Defendants deny that Mouloki was "the caretaker of Mr. and Mrs. Epee's children," but only cite to support that Mrs. Epee denies ever having an agreement with Mouloki to watch the children and do not deny that she lived in the bedroom with her children.  (Dkt. 149, ¶ 16; Dkt. 149-4, at 12, 55:10-12.)  The Court construes this to mean that the Defendants do not deny that Mouloki indeed cared for their children.  Defendants' witness Gislaine Ouandja explained that she would not say that Mouloki worked for the family like an employee, but cared for the children in that "The big kids were in charge of the kids.  So in that sense, yes…if there was something to do, they would be doing it but not working as an employee like, you know, on a shift or something like that."  (Dkt. 143-7, at 12, 83:4-20.)  She adds that it is normal for them to change other people's children's diapers, but "that's more an Africa thing."  (*Id.* at 13, 84:2-9.)
[6] Defendants dispute that they themselves ever woke Mouloki up in the middle of the night but do not dispute that Mouloki woke up to care for the children.  (*See* Dkt. 149, ¶ 14; Dkt. 149-6, at 13, 107:13-18.)
[7] Defendants dispute this in that they insist Mouloki was not their employee and therefore "never had to request days off," but they do not deny that Mouloki did not take days off.  (Dkt. 149, ¶ 17.)
[8] Defendants did not keep any records of what they provided Mouloki.  (Dkt. 143-8, at 4-5, Interrogatory No. 8.)
[9] Defendants argue that Mouloki was never "paid" because she was never an employee.  (Dkt. 149, ¶ 20.)

money to hold onto via Mrs. Epee when she had the funds to do so because she believed based on Mrs. Epee's comments that Mr. Epee had a bank account available where he could set the money aside for Mouloki to take with her when she left.[10] (Dkt. 143-1, at 6, ¶ 10; Dkt. 149, ¶ 21.)  He did not give her the money back. (Dkt. 149-7, at 4, 123:1-3; Dkt. 149, ¶ 22.)  The parties dispute whether Mouloki ever demanded the money back from Mr. Epee.  (Dkt. 149, ¶ 37; Dkt. 149-7, at 4, 123:1-6.)  Mouloki says that once when she asked Mrs. Epee for her money, Mrs. Epee told her that she would never see that money again and that it would be used to pay for Mouloki's return fare to Cameroon.  (Dkt. 149, at 7, ¶ 21; Dkt. 143-1, at 6, ¶ 10.)  Over the course of what became more than five years, Mr. Epee was aware that Mouloki lived in his home, cared for his children for long hours each day, and slept on a mattress on top of a bed base in his children's room.[11]  (Dkt. 149, ¶ 23.)

Mouloki says that during her years with the Epees they isolated her from others and did not permit her to leave the residence as she pleased.  (Dkt. 149, ¶ 24.)  Defendants point out that Mouloki was permitted to attend Epee family gatherings and that she kept her own acquaintances in Illinois.  (*Id.* at ¶ 24.)  Mouloki says that she "knew some people" but they were not friends.  (Dkt. 149-9, at 3, 100:5-10.)  Specifically, she knew two people, Bernadette and Flo, who babysat for friends of Mrs. Epee.  (Dkt. 149-9, at 3-4, 100:11-101:12.)  They "would get together at the barbecues" and "have sympathy for each other."  (*Id.* at 4, 101:7-9.)  Mouloki could come and go from the household when the Epees went on vacation and did not bring her with them. (Dkt. 143, ¶¶ 27-28.)  While she lived with the Epees, Mouloki had a cell phone that she kept in

---

[10] Mr. Epee denies this.  (Dkt. 149-7, at 3, 122:4-25.)
[11] Mr. Epee disputes that he was aware of Mouloki "working" to care for his children in that she was not an employee. (Dkt. 149, ¶ 23.)  He adds that he and Mouloki rarely spoke.  (*Id.*; Dkt. 149-4, at 12, 55:10-18; Dkt. 149-8, at 3, 113:2-5.)

her possession. (*Id.* at ¶ 29.) Sometimes, she held onto a set of keys to the Epee house.[12] (*Id.* at ¶ 26.) Sometimes she even took the bus to the mall on her own and left the house to do things without the Epees. (*Id.* at ¶¶ 30-31.)

Yet when Mouloki asked the Epees if she could return home to Cameroon when her sister became ill in 2006. (Dkt. 143-1, ¶ 12; Dkt. 149, ¶ 28.) Defendants refused, and Mouloki did not get to see her sister again before her sister died.[13] (Dkt. 149, ¶ 28.)

For the first several years, Mouloki did not have a physical encounter with either of the Epees. (Dkt. 143, ¶ 40.) Then one day in 2006, Mrs. Epee pushed Mouloki and pulled her by the shirt.[14] (*Id.* at ¶ 38; Dkt. 143-3, at 37-39, 64:23-66:7.) Mouloki had to go down the staircase, ostensibly to balance herself, but did not fall. (Dkt. 143-3, at 38-39, 65:24-66:5.) Mrs. Epee raised her hand up to hit Mouloki. (Dkt. 143, ¶¶ 39-40; Dkt. 14-3, at 39, 66:7-9.) Mouloki said, "[I]f you hit me, I will call the police." (Dkt. 143-3, at 39, 66:7-14.) Mrs. Epee replied, "[I]f there's anyone here who would call the police, it is me, because you do not have any papers here."[15] (*Id.* at 39, 66:14-16.) Mouloki testifies that Mrs. Epee threatened her repeatedly: "[W]henever [we] had problems, all the time she would say that to me." (*Id.* at 76, 113:24-114:10.) She also says that Mrs. Epee said to her: "[I]f the police found out that you were here…it's not only that you're going to be in trouble, not only that they're going to arrest you, but they're also going to take the keys and throw them in the river." (*Id.* at 96-97, 161:17-162:3; Dkt. 149, ¶ 25; Dkt. 149-3, at 3, 67:2-5.) Mouloki sometimes saw police while she was living

---

[12] Defendants assert that Mouloki had her own set of keys to their home, but Mouloki avers that she only had access to keys when she was with the Defendants' children. (Dkt. 143, ¶ 26.) Otherwise, she says, the Epees expected her to return the keys at all other times. (*Id.*)

[13] Defendants dispute this only in that Mrs. Epee testified that Mouloki never asked Mrs. Epee for help in returning to Cameroon to see her sister, but they do not dispute that they refused to let her go. (Dkt. 143, ¶¶ 41-42; Dkt. 149, ¶ 28; Dkt. 149-12, at 3, 92:3-8.)

[14] Mrs. Epee denies that these physical interactions occurred. (Dkt. 128, at 10; Dkt. 149-3, at 3, 67:6-8, 12-15.)

[15] Mrs. Epee also asserts that she never threatened Mouloki about contacting the authorities or having Mouloki imprisoned or deported. (Dkt. 149, ¶ 25.)

with the Epees, but she says she did not contact them "[b]ecause I did not have any identity."[16] (Dkt. 143-3, at 40, 67:2-22.)  Mr. Epee never used physical force or restraint against Mouloki, nor did he threaten to do either. (Dkt. 128, at 9; Dkt. 143, ¶¶ 32-33; Dkt. 143-3, at 38, 65:7-9.) He also did not threaten to call the police or make any threats to Mouloki regarding her immigration status.  (Dkt. 143, ¶¶ 35-36; Dkt. 143-3, at 75, 113:20-23.)

In 2006, Mouloki suffered an ulcer.[17]  (Dkt. 143-1, ¶ 11; Dkt. 149, ¶ 26.)  She stayed in the hospital three days and Mr. Epee came to pick her up and drive her back to the Epee household.  (Dkt. 149, ¶ 27.)  Mouloki still had staples in her stomach when she returned to the house.  (*Id.* at ¶ 27.)  Despite this, she immediately started caring for the children without time to rest and recover upon her return.[18]  (*Id.* at ¶ 27.)

Around 2007, Defendants told Mouloki that she would need to find a new place to live when they returned to Cameroon.[19]  (Dkt. 1, ¶ 47; Dkt. 143, ¶ 43.)  Mouloki learned that the Defendants were considering having her stay in the United States with Mrs. Epee's cousin, Marie Reed ("Mrs. Reed").  (Dkt. 1, ¶ 47.)  Mouloki spoke with Mrs. Reed about the possibility of working for her and disclosed what the Epees had paid her, as well as her working conditions. (*Id.* at ¶ 47.)  In response, Mrs. Reed told Mouloki that was the Epees were doing to her was wrong and the equivalent to slavery.  (*Id.*)   Mrs. Reed promise that if Mouloki could get herself to New York that Mouloki could stay with her.  (*Id.*)

---

[16] However, Mouloki also says that she was not aware that she needed papers to live in the United States until 2007. (Dkt. 143-3, at 40, 67:10-22.)
[17] The Parties dispute whether Mouloki suffered the ulcer because of "the stress of her poor living and work conditions." (Dkt. 149, ¶ 26.)
[18] Defendants dispute this only in denying that she went back to "work" because Defendants contest whether Mouloki actually worked for them.  (Dkt. 149, ¶ 27.)
[19] Mouloki denies that any such conversation ever occurred.  (Dkt. 143, ¶ 43; Dkt. 143-1, ¶ 15.)

On December 9, 2007, the Epees dropped Mouloki off at a shopping center to run errands for them.[20]  (Dkt. 1, ¶ 48; Dkt. 149, ¶ 29.)  They planned to pick her up several hours later.  (Dkt. 1, ¶ 48.)  Unbeknownst to the Epees, Mouloki had prearranged for someone to meet her at the shopping center that day and drive her to a friend's home, where she had started to store some of her belongs in anticipation of getting out of the Epee household.  (Dkt. 1, ¶ 48.)  She called a taxi with the help of her friend and asked the taxi to take her to the bus station in Chicago.  (*Id.*)  There, Mouloki boarded a bus heading to New York City.  (*Id.*)  Mouloki did not tell the Epees that she was leaving.  (Dkt. 143, ¶ 46.)  She went to live with Mrs. Reed, Mrs. Epee's cousin, who had told Mouloki that she could stay with her in New York.  (Dkt. 1, ¶ 47; Dkt. 143, ¶ 48; Dkt. 149, ¶¶ 29-30.)  Mouloki lived with Mrs. Reed until 2011.  (Dkt. 143, ¶ 49; Dkt. 149, ¶ 30.)  During this time, Mrs. Reed was also abusive to Mouloki.[21]  (Dkt. 149, ¶ 31.)

In 2012, while receiving additional treatment for her ulcer, Mouloki encountered a social worker at the hospital.  (Dkt. 149, ¶ 32.)  The social worker referred Mouloki to an attorney who referred Mouloki to Safe Horizon, who conducted intake with Mouloki on June 28, 2012.  (Dkt. 149, ¶¶ 33-34; Dkt. 143-1, ¶ 13.)  Safe Horizon worked with Mouloki to obtain her T-Visa, report her situation to the authorities, and find *pro bono* counsel for her civil suit.  (Dkt. 149, ¶ 35.)  In 2014, Mouloki obtained the T-Visa that she currently holds.  (Dkt. 143, ¶¶ 50-51.)

Mouloki continues to reside in the New York City area.  (Dkt. 143, ¶ 2.)  The Epees have returned to Cameroon.  (*Id.* at ¶¶ 5-6.)

On July 21, 2014, Mouloki filed this Complaint.  (Dkt. 1.)

---

[20] Parties dispute whether Mouloki "escaped" or simply left, arguing that she had the autonomy to leave at any time. (Dkt. 149, ¶ 29.)

[21] Defendants argue that this statement is subject and should thus be disregarded under Rule 56.1.  (Dkt. 149, ¶ 31.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the underlying substantive law that governs the dispute. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). The Court views the evidence in a light most favorable to the nonmoving party and draws all reasonable inferences in her favor. *See Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999) (internal citations omitted); *see e.g.*, *Duff v. Grandberry*, No. 14 C 8967, 2017 WL 2424236, at *1 (N.D.Ill. June 5, 2017) (citing *Popovits*, 185 F.3d at 731). Summary judgment is only appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

## **DISCUSSION**

In her Complaint, Mouloki sets forth nine counts against the Epees. Counts I-III allege violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") for peonage (18 U.S.C. §§ 1581, 1595), forced labor (18 U.S.C. §§ 1589, 1595), and trafficking into servitude (18 U.S.C. §§ 1590, 1595).[22] Count IV alleges a violation of the Fair Labor Standards Act ("FLSA") for violating its Federal Minimum Wage and Overtime Pay law (29 U.S.C. §§ 206, 207, 216(b)). The remaining counts allege state claims for not paying minimum wage and overtime compensation (820 ILCS 105/2, 105/4) (Count V); failure to provide the lawful frequency of payments (820 ILCS 115/3 – 115/5, 115/14) (Count VI); conversion (Count VII); fraudulent misrepresentation (Count VIII); and unjust enrichment (Count IX).

The Epees submit that the Court should grant summary judgment against most of Mouloki's claims either due to the inapplicability of the TVPRA based on timing (Dkt. 128, at 6-8) or for lack of timeliness for Counts IV-V and VII-IX (*Id.* at 12-17). To make this argument, the Epees move for leave to file an Amended Answer to the Complaint because they waited to use a statute of limitations defense until after the close of discovery so that they could assert it in good faith. (Dkt. 120, at 1-2.) The Epees also contend that no material, disputed facts remain that would allow Mouloki to prevail on the merits of her TVPRA or state law claims because the facts cannot show that the Epees coerced or harbored Mouloki (Dkt. 128, at 10-12); that Mouloki entered into a labor contract with Mr. Epee (*Id.* at 14)[23]; that Mouloki demanded that the Epees return a specified amount of money that they refused to give (*Id.* at 14-15); nor that Mouloki's

---

[22] Mouloki alleges each claim against both Defendants unless otherwise noted.
[23] Defendants do not seek summary judgment on Count VI for Frequency of Payments with regards to Mrs. Epee. (Dkt. 142, at 14.)

activities in the Epee household constituted a business rather than personal relationship (*Id.* at 15-17).[24]

## I. Motion for Leave to File an Amended Answer

As a threshold matter, the Epees move for leave to file an Amended Answer to the Complaint. (Dkt. 120.) The Epees did not plead any affirmative defenses in their Answer. (*Id.*, ¶ 2; *see* Dkt. 36.) They seek leave to amend their answer to include statute of limitations defenses for Counts IV-V and VII-IX. (Dkt. 120, ¶ 4.) The Epees state that they "can now in good faith claim that some of Plaintiff's claims are time barred" because "[f]act discovery is closed." (*Id.*, ¶ 3.) Parties must affirmatively state any affirmative defense in responding to a pleading. Fed. R. Civ. P. 8(c)(1). Following the 21 days after a party serves an answer, parties may seek a court's leave to amend. Fed. R. Civ. P. 15(a)(1)-(2).

District courts have "discretion to allow an answer to be amended to assert an affirmative defense not raised initially." *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005). However, "[a]s a general matter, an affirmative defense that is not timely pleaded is waived." *McGann v. PNC Bank, Nat. Ass'n*, 11 C 6894, 2013 WL 1337204, at *8 (N.D.Ill. Mar. 29, 2013) (quoting *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998)). Courts regularly deny motions for leave to amend an answer when a party waits months to make such a request, particularly if discovery is not necessary in order to assert a statute of limitations defense. *See e.g.*, *Lyon Financial Services v. Illinois Paper and Copier Co.*, 10 C 7064, 2016 WL 147654, at *18 (N.D.Ill. Jan. 13, 2016) (denied leave to amend and waived statute of

---

[24] Mouloki does not oppose Defendants' Motion for Summary Judgment regarding Counts I and V. (Dkt. 142, at 9, n.1; *id.* at 15, n.5.) In footnote 5, Mouloki refers to Count IV as the Illinois Minimum Wage Law, which misstates the claims from her Complaint, in which Count IV sought relief under the FLSA and Count V pursued the Illinois Minimum Wage Law ("IMWL"). Because Mouloki addresses Defendants' FLSA claim in her Response to their Motion for Summary Judgment, and does not address their IMWL arguments, the Court construes this error as Mouloki acquiescing to Defendants' motion regarding the IMWL under Count V.

x

limitations defense post-discovery when complaint made its availability apparent); *Sterling v. Riddle*, 99 C 2678, 2000 WL 198440, at *4 (N.D.Ill. Feb. 11, 2000) (same); *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997) (same).

Likewise here, the Epees' timeliness defense comes ironically late. The Epees moved to assert a statute of limitations defense on January 6, 2017, after fact discovery closed on December 31, 2016, some 17 months after Plaintiff filed her Complaint on July 21, 2014. (Dkt. 1; Dkt. 94; Dkt. 120.) In her Complaint, Mouloki stated that she lived with the Epees from May 8, 2002 to December 9, 2007, at which point Mouloki left the Epee household with the help of a friend. (Dkt. 1, ¶¶ 48-49.) Accordingly, at the time they were served with the Complaint, Defendants were aware of the exact timeframe alleged in the Complaint and had notice that a statute of limitations defense could apply given that Mouloki filed suit more than 6 years after she left the Epee household as alleged in her Complaint. No discovery was necessary to elucidate the viability of that defense and the information about when Mouloki lived with the Epees, as this was uniquely within the control of the Epees – they were clearly aware of when Mouloki lived with them. Because the Defendants were clearly put on notice of the availability of a statute of limitations when the initial complaint was filed, Defendants did not need discovery to become aware of this or assert the defense in good faith, as they contend. *See e.g.*, *Lyon Financial Services*, 2016 WL 147654, at *18; *Sterling*, 2000 WL 198440, at *4. Defendants have failed to provide an adequate reason for the delay, so the Court finds that they have waived this defense, and the Court denies them leave to amend their Answer.[25] [26]

---

[25] Because Defendants only submitted a statute of limitations argument against Mouloki's FLSA claim (Count IV) in their Motion for Summary Judgment, the Court denies summary judgment on this count. (*See* Dkt. 128, at 12.)

[26] Even if the Court granted Defendants leave to amend their Answer, they would not necessarily prevail. A litigant is entitled to equitable tolling where an "extraordinary circumstance stood in [her] way and prevented timely filing." *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 908 (7th Cir. 2016). To arrive in the United States and care for the children of a family that is not your own as an undocumented immigrant does not present the ordinary circumstances under which a potential plaintiff can become familiar with her rights. Mouloki contends that she did

## II. Motion for Summary Judgment

### A. TVPRA

#### 1. *Scope of TVPRA (Counts II and III)*

Congress first enacted the Trafficking Victims Protection Act on October 28, 2000. Congress has amended the Act several times in the years since. Most relevant to this case, the Trafficking Victims Protection Reauthorization Act of 2003 went into effect on December 19, 2003, and with it introduced 18 U.S.C. § 1595 – a civil remedy that created a private right of civil action for any victim to bring against his or her perpetrator for conduct violating Section 1589 for Peonage, Section 1590 for Forced Labor, and Section 1591 for Trafficking into Servitude. *See* Pub. L. 108-193, § 4(a)(4)(A), Dec. 19, 2003, 117 Stat. 2878. Section 1595 does not apply retroactively to conduct that occurred before December 19, 2003. 18 U.S.C. § 1595; *see e.g.*, *Ditullio v. Boehm*, 662 F.3d 1091, 1099 (9th Cir. 2011) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 249-50, 265, 269-70, 281-83 (1994) and *Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475, 1480, 1482 (9th Cir. 1997) (holding that Section 1595 does not apply retroactively because it added new legal consequences to TVPA violations and because it creates new liabilities rather than new rights); *Doe v. Siddig*, 810 F.Supp.2d 127, 136 (D.D.C. 2011) (applying Section 1595 retroactively would be "impermissible" but plaintiffs could pursue claims for conduct occurring after that date until her escape in 2009); *see also Labojewski v. Gonzalez*, 407 F.3d 815, 819 (7th Cir. 2005) (internal citations omitted) (when unclear whether a statute is meant to be retroactive, "prospectivity remains the appropriate default rule.").

---

not know that these rights existed until she spoke with a social worker in 2012. (Dkt. 142, at 20; Dkt. 143-1, ¶ 13.) Other courts have found that a plaintiff's limitations period tolled until at least she escaped from her employer's house. *See Cruz v. Maypa*, 773 F.3d 138, 145-46 (4th Cir. 2014). Nonetheless, the Court need not decide the issue at this time because it is moot without the Defendants' ability to assert their timeliness defense.

Because of this, Mouloki cannot hold the Epees liable under the TVPRA for conduct that occurred prior to December 19, 2003. This includes the conversations that took place with Mouloki while she still lived in Cameroon, her move to the United States in May 2002, and her first year and a half in the United States caring for the Epee children. (*See* Dkt. 1, ¶¶ 9-32.) However, whether the Epees engaged in conduct that violated the TVPRA after December 19, 2003 is a factual, rather than, legal question. *See Ditullio*, 662 F.3d at 1101; *Siddig*, 810 F.Supp.2d at 136. Accordingly, the Court grants Defendants' Motion for Summary Judgment for Counts II and III to the extent that Mouloki's TVPRA claims relate to conduct prior to December 19, 2003, and denies the Motion for conduct occurring after that date.[27]

2.      *Forced Labor (Count II)*

Timeliness and scope aside, Defendants move the Court to dismiss Count II on the merits. Count II seeks redress under the TVPRA's Forced Labor section, which provides in pertinent part that:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d) [which allows for fines].

---

[27] Defendants also assert that Mouloki cannot bring a claim pursuant to the 2008 TVPRA Amendments because all of the conduct in question occurred prior to Mouloki leaving the Epee household on December 9, 2007. (Dkt. 1, ¶¶ 48-49; Dkt. 128, at 7.) Mouloki has not asserted this portion of the Act. (Dkt. 142, at 10 n.2.) The Court thus declines to further analyze the matter.

18 U.S.C. § 1589(a); 18 U.S.C. § 1589(d).  As defined by the statute, "abuse or threatened abuse of law or legal process" includes administrative, civil, or criminal processes "in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).  Not only physical but psychological, financial, or reputational harm constitutes "serious harm" so long as it is sufficiently serious to compel a "reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).

In other words, if a defendant "knowingly obtains the labor or services" of someone by using "any scheme, plan, or pattern" intended to cause that person to believe that they would encounter serious harm or physical restraint should they not perform such labor or services, that will suffice even without the use or threat of actual physical force or restraint.  18 U.S.C. § 1589(a)(4).  Other courts have recognized that Congress enacted Section 1589 at least in part "to address the increasingly subtle methods of traffickers" who do not use physical violence or injury to induce their victims but instead preclude a victim's access to a passport; require her to work for 15 or more hours every day of the week without days off; decline to allow her to leave the home without supervision; limit her contact with her family; and isolate her from others in the community, all the while limiting or denying her compensation.  *See e.g.*, *Lagayan v. Odeh*, 199 F.Supp.3d 21, 28 (D.D.C. 2016) (citing *Kiwanuka v. Bakilana*, 844 F.Supp.2d 107, 115 (D.D.C. 2012) (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.)).  *Compare Muchira v. Al-Rawaf*, 14 C 770 (AJT/JFA), 2015 WL 1787144, *7 (E.D.Va. Apr. 15, 2015) (summary judgment granted where plaintiff outlined poor working conditions as domestic servant but was not threatened with consequences that would result if she broke "house rules").  Taken together,

such facts can evince a "scheme, plan, or pattern" intended to convince a plaintiff that serious harm or physical restraint would result if she did not continue to perform the labor and services.

Regarding Mrs. Epee, disputed material facts remain to determine whether her conduct toward Mouloki violated the Forced Labor provision of the TVRPA. According to Mouloki, in 2006, Mrs. Epee grabbed Mouloki's shirt during an altercation. (Dkt. 143-3, at 37-39, 64:23-65:6; 65:21-66:7.) Mrs. Epee denies that this occurred. (Dkt. 128, at 10; Dkt. 149-3, at 3, 67:6-8, 12-15.) And one time Mrs. Epee raised her hand up to hit Mouloki, which Mrs. Epee also denies. (Dkt. 143-3, at 39, 66:6-9.) Mouloki told Mrs. Epee that she would call the police, and Mrs. Epee replied that, if anyone should call the police, it should be her because Mouloki did not have her "papers." (*Id.* at 66:12-16.) Mouloki testifies that Mrs. Epee repeated such threats to her "whenever [they] had problems, all the time she would say that to me." (*Id.*, at 76, 113:24-114:10.) She also says that Mrs. Epee said to her "that if the police found out that [she was] here…it's not only that [Mouloki would] be in trouble, not only that they're going to arrest [her], but they're also going to take the keys and throw them in the river." (*Id.* at 96-97, 161:17-162:3; Dkt. 149, ¶ 25; Dkt. 149-3, at 3, 67:2-5.) Other courts have found that threats of deportation "can constitute serious harm to an immigrant within the meaning of the forced labor statute," or even alone can create a disputed issue of material fact about whether defendants abused the law or legal process or engaged in a scheme to mislead a TVPRA claimant. *See, e.g.*, *Elat v. Ngoubene*, 993 F.Supp.2d 497, 523 (S.D.Md. 2014) (internal quotations and citations omitted); *Aguirre v. Best Care Agency, Inc.*, 961 F.Supp.2d 427, 444-45 (E.D.N.Y. 2013) (citing *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) and *United States v. Kozminski*, 487 U.S. 931, 948 (1988)). There are numerous disputed material facts regarding the manner in which the parties met, came to live together, their interactions, their living conditions, their actions, and the

statements made to each other. Any one of a number of theories of human trafficking can be supported if a jury were to believe Mouloki's statements including, but not limited to, her physical interactions with Mrs. Epee and the alleged statements about Mouloki's immigration status coupled with the purported threats about what would happen to Mouloki if she went to the police, which precludes summary judgment.

The same is true for Mr. Epee. The words and actions of Mrs. Epee could be construed, if true, as more explicitly threatening, considering that Mr. Epee never used physical force or restraint against Mouloki, never threatened either, and did not threaten to call the police or invoke Mouloki's immigration status. (Dkt. 128, at 9; Dkt. 143-3, 38, 65:7-9; Dkt. 143-3, at 75, 113:20-23.) Yet a defendant need not employ any of these methods in order to be held liable under Section 1589. Mr. Epee was still at a minimum aware that Mouloki lived in his home, cared for his children for long hours each day, and slept on a mattress on top of a bed base in his children's room.[28] (Dkt. 149, ¶ 23.) He disputes that he took back the passport that Mouloki used to come into the United States, which calls into question his awareness and involvement with inhibiting Mouloki's access to her passport throughout her time with the Epees. (*Id.* at ¶ 10; Dkt. 143-3, at 29-30, 56:17-57:4; Dkt. 143-8, at 4, Interrogatory No. 6.) The record creates a question as to whether Mr. Epee denied Mouloki the ability to come and go from their home freely and limited contact with her family and friends. (Dkt. 149, ¶ 24; Dkt. 143, ¶¶ 26, 29-31; Dkt. 149-9, at 4, 101:7-9.) Further, he was also married to Mrs. Epee and lived in the same household as Mrs. Epee and Mouloki, which raises a material question about whether or not he participated in a scheme, plan, or pattern of conduct that caused Mouloki to stay and care for the Epee children and household against her will. (Dkt. 143, ¶ 7; Dkt. 143, ¶ 8.) These are facts that

---

[28] Mr. Epee disputes that he was aware of Mouloki "working" to care for his children, as he states that she was not an employee. (Dkt. 149, ¶ 23.) He adds that he and Mouloki rarely spoke. (*Id.*; Dkt. 149-4, at 12, 55:10-18; Dkt. 149-8, at 3, 113:2-5.)

together have been used to show in other courts that a defendant participated in a "scheme, plan, or pattern" intended to convince the plaintiff that she would encounter physical restraint if she stopped tending to the children and household. *See e.g.*, *Lagayan*, 199 F.Supp.3d at 28. Because of that, material questions of fact remain and the Court cannot enter summary judgment at this time on behalf of Mr. Epee. Accordingly, the Court denies summary judgment for both Defendants on Count II.

3.      *Trafficking into Servitude (Count III)*

Liability also incurs under Section 1590 of the TVPRA for "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter…" 18 U.S.C. § 1590(a). Mouloki waives this claim as it pertains to the Epees' recruiting, transporting, or obtaining her labor or services, so the Court need not analyze whether such conduct occurred before or after the Act's December 19, 2003 enactment, as the Defendants argue should end the claim. (Dkt. 128, at 11-12; Dkt. 142, at 14-15.) Instead, the Court focuses on Mouloki's claim that the Epees knowingly harbored her for her labor or services. (Dkt. 142, at 14-15.)

First, as discussed, conduct beginning or continuing after December 19, 2003 leaves a question of fact to determine the liability of the defendants, so Defendants' motion cannot succeed on this basis as they provide. *See infra*, Part II.A.1. (*See* Dkt. 128, at 11-12.) Because Count II survives, a violation of the TVPRA remains and thus the Court cannot grant Defendants summary judgment on Count III on the grounds that Mouloki's other TVPRA claims fail. *See supra*, Part II.A.2. (*See id.* at 12.)

Moreover, Mouloki creates a material disputed fact as to whether the Epees' conduct constitutes "harboring" her for her labor or services. The TVPRA does not define what it means

to "harbor," *see* 18 U.S.C. § 1590, but at least one other court has found that plaintiffs sufficiently pled a claim against a hotel operator for knowingly providing lodging to someone for obtaining sexual labor or services. *See e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017). In other words, providing lodging to someone for the purposes of obtaining her labor or services against her will constitutes "harboring." Under this definition, it is reasonable to infer that the Epees could have "harbored" Mouloki, since it is undisputed that they provided lodging and a question remains as to whether that was intended to obtain her labor or services. (*See* Dkt. 143, ¶ 8; Dkt. 149-4, at 12, 55:5-9.) Because the set-up the Epees provided to Mouloki creates a question of fact as to whether the Epees knowingly sought to induce Mouloki's services, the Court declines to grant summary judgment on Count III.

**B.    State Claims**

*1.    Frequency of Payments (Count VI)*

Defendant Mr. Epee contends that judgment should be entered in his favor for Mouloki's Frequency of Payments claim because no disputed, material facts remain that could show that he entered into an employment agreement with Mouloki. (Dkt. 128, at 14.) Illinois's Wage Payment Act provides that: "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. To show a claim under 820 ILCS 115/5, a plaintiff must demonstrate among other elements that the parties entered into an "employment contract or agreement." *Catania v. Local 4250/5050 of the Communications Workers of America*, 359 Ill.App.3d 718, 724 (1st Dist. 2005).

Defendant Mr. Epee asserts that Mouloki never discussed compensation, hours, employment tasks, or any other related items with him such that no material fact issues remains

that could allow Mouloki to show that she entered into an employment "agreement" with him. (Dkt. 128, at 14.) However, an employment "agreement" here need not involve a formally negotiated contract. *Catania*, 359 Ill.App.3d at 724 (discussing *Landers-Scelfo v. Corporate Office Systems, Inc.*, 356 Ill.App.3d 1060, 293 Ill.Dec. 170, 827 N.E.2d 1051 (2005)). Under the Wage Payment Act, parties need only demonstrate "a manifestation of mutual assent on the part of two or more persons…." *Id.* (citing *Landers-Scelfo*, 356 Ill.App.3d at 1067-68). Further, an "employer" under the Act includes individuals, such as officers of corporations or agents of an employer, who "knowingly permit[] the employer to violate the provisions of the Wage Payment Act," and those individuals can be held liable as long as they had the right to control the "manner and method" in which the employee performed her work. *Id.* at 724-25.

Taken together, questions of material fact remain as to whether Mr. Epee and Mouloki had an employment agreement. The record shows that Mr. Epee was aware of and accepted the benefit of Mouloki's care for his children while he knew that she received money and lodging from his household. (*See* Dkt. 149, ¶ 23; Dkt. 149-7, at 2-3, 121:1-122:3; Dkt. 149-7, at 4, 123:1-3; Dkt. 149, ¶ 22.) Such transactions suggest mutual assent to an exchange that suggests an agreement between the parties, even if informal. *See Catania*, 359 Ill.App.3d at 724. Material, disputed facts therefore remain as to whether Mouloki and Mr. Epee indeed formed an agreement, so the Defendant's argument fails on these grounds. The Court denies summary judgment as to Count VI.

2.      *Conversion (Count VII)*

Defendants argue that Mouloki cannot show a claim for conversion because she never demanded possession of the money that she says Defendants owe her, and she cannot establish the specific amount of money owed. (Dkt. 128, at 15.) Conversion claims indeed require

plaintiffs to show that they demanded possession of the property. *See e.g.*, *Johnson v. DiPaolo*, 14 C 8199, 2016 WL 6568067, at *2 (N.D.Ill. Nov. 4, 2016) (citing *Cirrincion v. Johnson*, 184 Ill. 2d 109, 114 (Ill. 1998)). *Cf. Deane v. Fort Dearborn Trust & Savings Bank*, 241 Ill.App. 517, 530 (Ill.App. July 28, 1926) (plaintiff may otherwise show that a demand would have been unavailing and therefore unnecessary). Other courts have also found that a plaintiff pursuing a conversion claim for money must show that she has a right to a "specific, identifiable amount of money." *See e.g.*, *Avila v. Citimortgage, Inc.*, 13 C 3566, 2013 WL 5477574, at *3 (N.D.Ill. Oct. 2, 2013) (citing *3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 F.Supp.932, 940 (N.D.Ill. 2000)). That amount can be specific and identifiable in that it has been segregated from other funds. *See e.g.*, *3Com Corp.* 104 F.Supp.932 at 940.

Whether Mouloki made a demand for a particular amount of money that Defendants refused remains an open question of material fact. It is undisputed that Mr. Epee still has approximately $600 that Mouloki asked him to hold for her. (Dkt. 159, at 8-9, ¶ 22.) Yet Mouloki never asked Mr. Epee for the money that she asked him to hang onto for her, and Defendants say that Mr. Epee never held money in a separate savings account. (Dkt. 149, at 12, ¶ 36; Dkt. 149-7, at 1-4, 120:16-123:6.) At the same time, Mouloki says that Mr. Epee kept a portion of her earnings in a savings account and that when she asked Mrs. Epee for her money once Mrs. Epee told her that she would never see that money again because it would be used to pay for Mouloki's return fare to Cameroon. (Dkt. 149, at 7, ¶ 21; Dkt. 143-1, at 6, ¶ 10.) Especially in light of the facts indicating that the Epees may have held on to some of Mouloki's funds and that Mr. Epee would still give Mouloki the money if she asked for it because "[i]t was her money" (Dkt. 149-7, at 4, 123:4-6), the credibility of the parties' statements will have to be used to determine whether the funds could be gleaned from the use of a separate bank account

specifically used for Mouloki's earnings and whether Mouloki ever actually asked for the funds. The Court therefore denies summary judgment on Count VII.

3.    *Fraudulent Misrepresentation (Count VIII)*

Further, Defendants argue that Mouloki cannot bring a fraudulent misrepresentation claim because such claims narrowly relieve "cases involving business or financial transactions between parties," *see e.g.*, *Bonhomme v. St. James*, 361 Ill. Dec. 1, 10 (Ill. 2012), and because the tort covers false statements of material fact, whereas Mouloki admits that she did not discuss the exact amount or terms of the salary, wages, or compensation. (Dkt. 128, at 16-17.)

First, a question remains as to whether this case indeed involves "business or financial transactions between parties." *See e.g.*, *Bonhomme*, 361 Ill. Dec. at 10. Defendants acknowledge that Mr. and Mrs. Epee provided Mouloki money. (Dkt. 128, at 17 n.1.) Defendants characterize this as money "given to help out Mouloki when she needed it." (*Id.*) Mouloki calls the money wages. (*Id.*) The nature of the cash given by the Epees to Mouloki very much affects whether their relationship was more like a business transaction or a personal relationship where Mouloki cared for the children and household akin to a family member. The record leaves this question open.

Second, Defendants state that Mouloki never discussed the exact salary, wages, or amount of compensation with Mrs. Epee before she traveled to the United States. (*Id.* at 17.) Yet Defendants fail to show any law requiring that a claimant would need to show that a defendant made fraudulent statements about specific values in order to show fraudulent misrepresentation. Indeed, to make out a fraudulent misrepresentation claim in Illinois, a plaintiff must show that a defendant made a false statement of material fact known or believed to be false by the party making it with the intent to induce the other party to act, and that the

statement induced the other party to act in reliance on the truth of the statement, leading to damages. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). According to Mouloki, Mrs. Epee promised her before Mouloki came to the United States among other things that she would pay Mouloki a "good salary." (Dkt. 143-1, at 5, ¶ 3.) Mrs. Epee also told Mouloki that Mouloki would only be in the United States for three years. (Dkt. 143-3, at 30, 57:16-24.) Ultimately, the Epees gave Mouloki cash in an amount below the minimum wage and Mouloki did not return to Cameroon within three years. (Dkt. 143-1, at 2, ¶ 12; Dkt. 143-3, at 35-36, 62:6-63:12.) Mrs. Epee's statements could therefore be construed as false statements, particularly in light of the purported instances of physical and psychological threats made to Mouloki, which suggest that she did not necessarily intend to provide Mouloki with the physical and psychological autonomy that comes with a "good salary" or the freedom of movement to travel. (Dkt. 143-3, at 37-39, 64:23-66:5; *id.* at 48, 78:2-12; *id.* at 75-76, 113:20-114:10; *id.* 96-97, 161:17-162:3.) It is reasonable to infer that the ultimate results of a circumstance initiated by Mrs. Epee could be that which she intended. Accordingly, a question of fact remains as to whether the statements made to Mouloki induced her to move to the United States and care for the Epees' children under false pretenses. The Court denies summary judgment on Count VIII.

4.      *Unjust Enrichment (Count IX)*

Counts IV and VI-VIII remain, thus rendering moot Defendants' argument that the Court should grant summary judgment in their favor for Count IX on the basis that an unjust enrichment claim cannot stand if its related claims fail. (Dkt. 128, at 18-19.) *See Enger v. Chi Carriage Cab Corp.*, 812 F.3d 565, 570 (7th Cir. 2016) (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)). Because Defendants only move for summary judgment against

Count IX on these grounds, the Court denies summary judgment for Mouloki's unjust enrichment claim.

## CONCLUSION

For the above reasons, the Court denies Defendants' Motion for Leave to File an Amended Answer to the Complaint. [120] The Court grants Defendants' Motion for Summary Judgment with regards to Counts I and IV, and also Counts II and III to the extent that Plaintiff's TVPRA claims relate to conduct that occurred before December 19, 2003, when Congress enacted the statute. The Court denies summary judgment for Counts II and III for any conduct occurring after that date and for all other counts. [126]


Hon. Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: June 29, 2017